STATE OF NEBRASKA, APPELLEE, V. HATTIE SMITH,
ALSO KNOWN AS HATTIE BROWN, APPELLANT.

276 N. W. 2d 104

Filed March 6, 1979.  No. 42019.

Thomas M. Kenney, Douglas County Public Defender, and Bennett G. Hornstein, for appellant.

Paul L. Douglas, Attorney General, and Terry R. Schaaf, for appellee.

Heard before SPENCER, Retired Justice, BOSLAUGH, CLINTON, and WHITE, JJ., and BARTU, District Judge.

BARTU, District Judge.

This is an appeal from a conviction and sentence for second degree murder by the appellant-defendant, Hattie Smith, also known as Hattie Brown.  An earlier trial resulted in a hung jury and a mistrial.  She assigns as error the denial of a new trial upon the ground of newly discovered evidence.

The defendant shot and killed William E. Brown, her husband, in the parking lot of the Easy Drive Through Liquor Store at 24th and Clark Streets in Omaha, Nebraska, at approximately 12:30 p.m., May 31, 1977.  These facts are undisputed.  The defendant admitted the shooting, but alleged she acted

in self-defense. Her intent, at the time of the shooting was the ultimate question for the jury. The accounts of the shooting are in conflict.

Ike Seals testified that immediately prior to the shooting he was standing in the back parking lot of the liquor store and observed the victim drive up in his car, park it, and get out. As he did so, Seals called to Brown and asked him to get him a can of beer from the liquor store. At approximately the same time, he observed a car pull into the parking area of the liquor store and someone in the car said something to the victim. As Brown turned around by his car door, he was shot by the defendant, who was 10 or 15 feet away, sitting in the car that had just entered the parking lot.

Elton Brunt testified that he observed the incident from about 50 feet away and he saw the defendant and the decedent standing between the two cars, 2 or 3 feet apart, in the parking lot area of the liquor store. It appeared to him that the defendant and her husband were arguing or quarreling, and the deceased had the defendant's arm in his grasp. The defendant jerked away from Brown. Brunt heard a shot and saw the victim fall.

Robert Hoskins, Jr. related that as he drove into the parking lot of the liquor store, the defendant was standing in back of a car and she called to him as he drove in. He stopped and the defendant entered his car. She was sitting in the front seat facing him and talking with him as Brown approached the automobile on the passenger side. Brown commanded the defendant: "Hattie, get out of that damn car." The decedent opened the passenger door and reached in and grabbed the defendant by her arm. The defendant then got out of the automobile and said to her husband, "You ain't going to beat me no damned more." Immediately thereafter, the shooting occurred.

The defendant testified that she and her husband

moved to Omaha from Florida in 1970 and during the course of the marriage he kept the company of other women. He lived with her and their children off and on. As to the shooting, she related that she heard her husband tell her to get out of the Hoskins vehicle. She did not remember how she got out but as she did so she was "scared" and withdrew from her bosom a gun, which she had purchased 3 or 4 days earlier. When she got out of the Hoskins auto, her husband stepped back and she observed that he had his fist drawn back to hit her. She then closed her eyes and pulled the trigger.

Investigating officers from the Omaha police department testified that immediately following the shooting incident, while in a police cruiser, the defendant was crying and stated that she had been afraid and shot her husband because he had beaten her the day before. While at the police station, the defendant was very emotional and exhibited a bite mark on her left breast and brusies on her right arm which she claimed had been inflicted by the victim.

On cross-examination, the State was permitted to question the defendant with regard to a life insurance policy on the life of her husband. The defendant related that she made a telephone call to the Teamster's Union office about 4 hours after the shooting to find out if her husband had insurance, and if so, how much. On redirect examination, the defendant testified she learned of the insurance policy after the shooting through a telephone call her mother had made to her husband's mother in Alabama. The decedent's mother had indicated there was an insurance policy, that the defendant was the beneficiary, and that it was her obligation to bury her husband.

The defendant further testified that William E. Brown had, on prior occasion, assaulted her and threatened her life. This testimony was corroborated by Amos Jones, the 10-year-old son of the defendant.

Robert Wolf and Joseph Patrylak, Omaha police officers, testified that on May 30, 1977, the day before the shooting, they investigated a disturbance incident between the defendant and her husband at 16th Street and Commercial Avenue in Omaha. On that occasion, they observed the defendant standing outside an automobile in which her husband and a female companion were sitting and the defendant was yelling obscenities at him. The officers told the deceased to leave the area, and as he did so, the defendant yelled, "It's not over," or, "this thing is not over." The defendant testified that this incident was prompted by Brown being with Tara Smith and by the failure of her husband to give her any money for rent, because she had received notice that she and her family were going to be evicted from their apartment.

Curtis Johnson, an employee of National Disposal Company and working partner of the victim, testified that the Brown marriage was "off and on" and that upon one occasion, the defendant had come out to the garbage route where he and Brown were working, seeking her husband. On that occasion, Brown hid from the defendant behind some cars, called his employer, and was removed from the route pursuant to his request.

Subsequent to the trial and conviction, but prior to sentencing, the defendant filed her motion for a new trial, and supported the same with the following affidavit:

"John Henry Pargo, being by me first duly sworn upon oath deposes and states as follows: That on May 31, 1977 he was in Herbs which is located across the street from the E. Z. Drive Thru Liquor Store, that he was playing pool with William E. Brown, that William E. Brown was drinking some whiskey, that William E. Brown sent a Robert Frog Thomas to the E. Z. Drive Thru to buy some wine, that when he came back he told William Brown that Hattie was

over at the E. Z. Drive thru, [sic] that William Brown threw his pool stick down and said 'I am going to kill that bitch,' that said William Brown jumped into his car and sped over to the E. Z. Drive Thru, that about ten minutes later he heard a shot from the E. Z. Drive Thru, that he went over and saw William lying on the ground, that William E. Brown looked up, groaned and then died, that he was not contacted by the Omaha Police Department, that he contacted no one until now, that he has been out of town, that he is willing to submit to a polygraph test as to what he saw and heard on May 31, 1977.''

There is no dispute whatsoever in this case that the evidence on which defendant relies was newly discovered evidence which she could not, with reasonable diligence, have discovered and produced at the trial. The record clearly establishes that witnesses to the shooting were extremely reluctant to acknowledge themselves, did not do so at the scene of the shooting, and appeared at trial only under subpoena.

The issue squarely presented is whether the newly discovered evidence satisfies the other requirements of section 29-2101 (5), R. R. S. 1943.

Newly discovered evidence must be of such a nature that if offered and admitted at the former trial, it probably would have produced a substantial difference in result. Such evidence must be relevant and credible, and not merely cumulative. It must involve something other than credibility of witnesses who testified at the former trial. Finnern v. Bruner, 170 Neb. 170, 101 N. W. 2d 905 (1960); State v. French, 200 Neb. 137, 262 N. W. 2d 711 (1978).

Had the identity of John Pargo been known to the defendant, his testimony would have been relevant and credible at the time of trial. The statement of William E. Brown to him, ''I'm going to kill that bitch,'' although hearsay, would have been admis-

sible under section 27-803 (2), R. R. S. 1943, as a statement of the declarant's then existing state of mind and emotion to show his intent, plan, motive, or mental feeling, and inferentially, his demeanor and actions prior to the shooting. Exclusion of the evidence, had it been available to and offered by the defendant at trial, would have constituted reversible error. The jury's determination of the defendant's guilt or innocence inevitably rested on the intent of the defendant immediately prior to the shooting, and the presentation of the newly discovered evidence might very well have resulted in a verdict of manslaughter or an acquittal. It is essential when a jury is required to determine the intent of the defendant in a criminal action that it be given an opportunity to assess all relevant evidence before it reaches its decision. Fundamental due process requires that the defendant be granted a new trial to permit her the opportunity to present such evidence to the jury.

The judgment of the District Court overruling and denying defendant's motion for a new trial is reversed. The matter is remanded to the District Court for a new trial to be held within 60 days of the mandate herein in conformity herewith.

REVERSED AND REMANDED FOR A NEW TRIAL.